LUCY RAYNOR, an Infant, by JOHN CARMAN, her Guardian ad Litem, Plaintiff, *v.* THE NEW YORK AND LONG ISLAND TRACTION COMPANY, Defendant.

(County Court, Nassau County, June, 1914.)

Damages — compensatory — street railways — ejection therefrom — refusal to pay additional fare.

The routes of defendant, a traction company, between Mineola and Freeport covered by its 1901 franchise and between Freeport and the New York city line covered by its 1903 franchise, are connecting lines within the meaning of " any connecting line or lines " as used in said franchise which provides that said traction company will issue to and receive from any connecting line or lines transfers and that there shall be a division of the fares in proportion to the distance traveled by the passenger at the rate of five cents for five miles.

A passenger boarding one of defendant's cars at Milburn avenue, Baldwin, is entitled to ride to Doubleday, Page & Co.'s publishing house at Garden City, a distance of about eight miles, upon payment of a ten-cent fare, and her ejection from the car at a point fifty feet from the point of her destination because of her refusal to pay an additional five-cent fare or get off is unlawful.

Under its franchises defendant was not justified in requiring the passenger to pay the additional fare and she being lawfully on the car was entitled to ride to her destination and had a right to resist defendant's servants in removing her from the car to the full extent of maintaining her rights and was entitled to recover compensatory damages for injuries sustained by her in her forcible ejection from the car.

County Court, Nassau County, June, 1914.   [Vol. 86.

Action to recover damages for wrongful ejection.

Edwards & Levy (Elvin N. Edwards, of counsel), for plaintiff.

James L. Quackenbush (Arthur G. Peacock and Henry J. Smith, of counsel), for defendant.

Niemann, J.   The plaintiff sues to recover damages for an assault and battery alleged to have been committed upon her by four of the defendant's employees on the 1st day of May, 1913, when she was a passenger on one of the defendant's cars.   The case was tried before the court and a jury, but at the close of the evidence counsel for both sides entered into a stipulation discharging the jury and submitting the case to the court for decision both upon the facts and the law.

The evidence shows that the plaintiff boarded one of the defendant's cars at Milburn avenue, Baldwin (railroad stop No. 81), bound for her place of work, at the publishing house of Doubleday, Page & Company, at Garden City.   The conductor came to her and she handed him ten cents, saying that she wanted to go to Doubleday's.   When the car reached a point about fifty feet south of the tracks of the West Hempstead branch of the Long Island railroad, below Doubleday, Page & Company's plant, four men got on the front of the car.   The conductor went to the front of the car, came back and said, "Here is a young lady who won't get off."   Thereupon the four men came to her and demanded that she pay the additional fare or get off, which she refused to do.   After some discussion between plaintiff and these four men as to her right to ride to the entrance of Doubleday's, the men took hold of her, "grabbed" her, as she says, and pulled her out of her seat.   They took her

struggling and resisting to the back platform of the
car and asked her to step down on the ground. She
refused. Thereupon one of the men kicked her feet
from under her, causing her to fall off the car, and as
she dropped from the car she was caught by men stand-
ing on the ground.

Thus the question arises whether the plaintiff was
lawfully ejected for her refusal to pay the additional
fare which the company claims it had the right to
demand of her; and this brings up for consideration
the question whether the defendant was entitled under
the different franchises which it holds and under which
it is operating this line of cars to exact a sum greater
than ten cents for one continuous passage from Mil-
burn avenue, Baldwin, to the entrance of the plant of
Doubleday, Page & Company, at Garden City.

On February 27, 1899, the Mineola, Hempstead and
Freeport Traction Company was incorporated for the
purpose of building, maintaining and operating from
points in the village of Mineola to points in the village
of Freeport in the county of Nassau, a trolley railroad.
Thereafter, on June 6, 1901, it obtained from the board
of highway commissioners of the town of Hempstead
a franchise authorizing it to construct and operate a
trolley line beginning at a point on Washington street,
where the said street enters the town of Hempstead,
running thence southerly on and along said Washing-
ton street and into the village of Hempstead; thence
along certain designated streets to the village of Free-
port, and from the southerly end of Grove street in
said village along a road unnamed, running southerly
from the Woodcleft Inn to the open water.

Various conditions and provisions were embodied in
said franchise, among them one regulating the fare to
be charged each passenger. It provides (paragraph 6)
that " the maximum rate for one continuous passage

in either direction over the entire line as herein described shall not exceed ten cents, and shall not exceed five cents for any five miles or less, and that said Mineola, Hempstead and Freeport Traction Company will issue to and also receive from any connecting line or lines, now or hereafter to be built, upon payment of one fare therefor (said fare to be agreed upon by said railroads), transfer checks or tickets, the fare paid to be divided between the connecting companies in proportion to the distance traveled by the passenger, and in no case shall the proportion charged by said Mineola, Hempstead and Freeport Traction Company exceed ten (10) cents, for passage over its entire road, as herein described, and shall not exceed five cents for any five miles or less.''

The company accepted said franchise so granted by said board and constructed its road and operated it as provided in the franchise, with the exception, however, that instead of constructing it over Washington street, as provided for in the franchise, it constructed it over Franklin street, a county highway, under a franchise which it obtained from the board of supervisors of Nassau county. This franchise was confirmed by the board of highway commissioners, to the extent of their authority over said highway, by a resolution authorizing the construction and operation of said street surface railroad.

It was claimed by the defendant that the clause providing for transportation for any five miles or less for five cents, contained in the said franchise obtained from the board of highway commissioners, has no application to the Franklin street route, since that line is operated under a franchise obtained from the board of supervisors, and contained no such provision. This question came up before the public service commission, second district, on the complaint of *Charles E. White-*

*house* v. *New York & Long Island Traction Company*, and resulted in a decision by said commission that the company was bound by the fare provisions in the town franchise for the route over Franklin street.   3 P. S. C., 2d D., 410.

On February 3, 1903, the New York and Long Island Traction Company (the successor in name of the Mineola, Hempstead and Freeport Traction Company), obtained from the board of highway commissioners of the town of Hempstead a franchise to construct, maintain and operate a street surface railroad from a point at the westerly village limits of the village of Freeport and running thence westerly along certain designated roads, avenues and streets and through private propperty until it reaches the New York city line.

Among the provisions of this franchise is one regulating the fare to be charged and the giving of transfers.

Paragraph 7th provides that '' the maximum rate for one continuous passage in either direction over the entire route as herein described shall not exceed fifteen (15) cents, and shall not exceed five (5) cents for one continuous passage between Rockville Centre and Freeport, and that said The New York and Long Island Traction Company will issue to and also receive from any connecting line or lines now or hereafter to be built, upon payment of one fare therefor, said fare to be agreed upon by said railways, transfer ·checks or tickets, the fare to be divided between the connecting companies in proportion to the distance travelled by the passenger, and in no case shall the proportion charged by The New York and Long Island Traction Company exceed fifteen (15) cents for passage over its entire route from New York City Line to Freeport village line, herein described, and shall not exceed five (5) cents for any five miles or less.''

The main question involved in this case turns upon the construction of these two provisions regulating the fare to be charged and the issuing of transfers.

It is contended by the learned counsel for the plaintiff that the provision contained in the franchise of June 6, 1901, regulating the fare, limits the company to a charge of five cents for five miles; in other words, that the company must carry passengers from Mineola to Freeport for ten cents and any five miles thereof for five cents.

There can be no doubt that the company cannot charge more than the maximum of fare prescribed over this particular line, that is, ten cents for one continuous passage. In addition to specifying a maximum of fare for the whole trip, the said franchise states that the maximum fare for any portion of the whole trip not exceeding five miles shall not exceed five cents.

Under this provision the company is limited to a charge of five cents for five miles, while the public is bound to pay five cents for a ride of less than five miles.

This interpretation of the provisions of said franchise was made by the public service commission, second district, in the case of *Edwards* v. *New York & Long Island Traction Company*, 1 P. S. C., 2d D., 17, where it was ordered that the company charge not to exceed five cents fare for a continuous trip of five miles or less over any portion of its line described in its articles of association, which is the route described in the franchise of June 6, 1901, as changed in part by the franchise obtained from the board of supervisors of Nassau county for the line over Franklin street.

At the outset it may be well to consider a few of the general principles of construction as a guide to the correct interpretation of the franchises here under consideration.

A franchise is a contract and hence is subject to the
same general rules of construction as any other writ-
ten instrument.  *Trustees of Southampton* v. *Jessup,*
173 N. Y. 84, 89.  No doubt the rule of construction
that in franchises the grantees are to take only what
is clearly granted, and that they shall take nothing by
implication which is not necessary for the full and fair
enjoyment of the thing granted, has application only
to a franchise whose terms are ambiguous and from
which it is attempted to spell out privileges or rights
not within the ordinary meaning of the words used.
In such case the instrument must be construed against
the grantee and in favor of the public.  *Mayor* v.
*Broadway & Seventh Avenue R. R. Co.,* 97 N. Y. 281;
*Dermott* v. *State,* 99 id. 101, 107; *Mayor* v. *Starin,* 106
id. 1, 19.  But in the case of a franchise which is free
from ambiguity, where the words used are so clear
that only one meaning can be attached to them, it is
the duty of the court to give force to the provisions of
the contract, giving the language used its ordinary
and accepted meaning.

The rule of construction which governs the inter-
pretation of contracts is stated by Martin, J., in the
case of *Gillet* v. *Bank of America,* 160 N. Y. 549, 555,
as follows: " In the construction of written contracts
it is the duty of the court, as near as may be, to place
itself in the situation of the parties, and from a con-
sideration of the surrounding circumstances, the occa-
sion and apparent object of the parties, to determine
the meaning and intent of the language employed.
Indeed, the great object, and practically the only foun-
dation of rules for the construction of contracts is to
arrive at the intention of the parties.  This is a most
conspicuous and far-reaching rule, and involves the
nature of the instrument, the condition of the parties
and the objects which they had in view, and when the

intent is thus ascertained, it is to be effectuated unless forbidden by law. ' Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish.' "

" It is a well-established canon of interpretation that in seeking for the intent of parties the fact that a construction contended for would make the contract unreasonable and place one of the parties at the mercy of the other may be properly taken into consideration." *Schoellkopf* v. *Coatsworth,* 166 N. Y. 77, 84; *Sanford* v. *Brown Brothers Co.,* 208 id. 90, 96.

The two franchises here under consideration provide that the defendant will issue to and receive from any connecting line or lines transfers, and that there shall be a division of the fares in proportion to the distance traveled by the passenger at the rate of five cents for five miles. The whole case thus resolves itself into the question, are the routes between Mineola and Freeport covered by the 1901 franchise and between Freeport and the New York city line covered by the 1903 franchise, connecting lines within the meaning of the words " any connecting line or lines " as used in the said franchises?

It is argued by the learned counsel for the defendant that when the highway commissioners spoke of " railroads " and " the fare to be divided between the connecting companies " they contemplated the construction of other lines by other railroad companies, because no division of the fares can be made when one company owns and operates the several lines and that no transfers are necessary when the one company operates the two lines together and as a unit. In short, that the five cents for five miles provision of the franchise dated June 6, 1901, for the route between Free-

port and Mineola, does not affect any part of the line west of Freeport, that is the line between Freeport and the New York city line, and that the provision for the exchange of transfers and division of fares does not apply between the routes of the same company.

It is practically conceded by the defendant that if another company had acquired the franchise dated February 3, 1903, and was operating the line from Freeport to the New York city line, both companies would under the terms of their respective franchises be compelled to issue and receive transfers and divide the fare between themselves according to the distance traveled by the passenger, but it is claimed that, by reason of the fact that this defendant itself owns both franchises and operates both routes, the lines cannot be considered connecting lines and hence said fare rate and transfer provisions have no application and must completely fail.

Such a narrow construction would have the result of depriving the people of one of the valuable considerations for which both of said franchises were granted, namely, the privilege of riding a distance of five miles for five cents whether said distance be covered entirely upon the old line or be divided up with the new or connecting line. A reading of both of these franchises (granted by the same highway commissioners and dealing with the same subject matter) convinces me that the real intent and purpose of these provisions was to secure to the public this fare and transfer concession.

As it was intended that transfers should be given upon payment of a single fare, it seems to me there is no just reason why the defendant should be exempt from this fare provision simply because it owns and operates the line under the franchise of 1903, and that it will, therefore, be unnecessary to issue transfer

14

tickets. In a broad sense, said routes operated under the 1901 and 1903 franchises are connecting lines. They may be deemed connecting lines and should in the observance of good faith on the part of the defendant be considered so. It is the spirit of judicial decisions that statutes and franchises giving valuable powers and privileges to corporations should be liberally construed in the public interest. *Coosaw Mining Co.* v. *South Carolina,* 144 U. S. 550, 561; *Minor* v. *Erie R. R. Co.,* 171 N. Y. 566, 573; *O'Reilly* v. *Brooklyn Heights R. R. Co.,* 95 App. Div. 253, 261; affd., 179 N. Y. 450; *Jenkins* v. *Brooklyn Heights R. R. Co.,* 29 App. Div. 8. If the franchises in question will bear the construction here given, it seems to me it should be made, rather than by a strict, literal construction to defeat the real object intended by the parties. If there is any doubt as to whether this construction or the one contended for by the defendant should be adopted, assuming that either of the two is possible, the general rule, stated by Mr. Justice Harlan in *Coosaw Mining Company* v. *South Carolina, supra,* cited with approval by Chief Judge Parker, in the case of *Minor* v. *Erie R. R. Co., supra,* should be applied, namely, " the interpretation must be adopted which is most favorable to the state."

In *Braffett* v. *Brooklyn, Q. C. & S. R. Co.,* 204 N. Y. 440, the question arose whether a merger or consolidation of two street surface railroads would exempt them from the conditions imposed by sections 101 and 104 of the Railroad Law, which provide for the giving of transfers without extra charge between street surface railroads having contracts for the use of their respective roads or routes. Judge Cullen, writing for the court, said (p. 446): " There is absolutely no reason why a merger or consolidation should be exempt from conditions imposed in the case of leases

or traffic agreements and the courts should not import such an exemption into the statute unless the phraseology of the statute requires it.'' And so it may be said in this case that there is no valid reason why the defendant should be exempt from these provisions as to the rate of fare and the giving of continuous passage at the fixed rate simply because it is the connecting company itself. The defendant admits that if another company had obtained the franchise of 1903 defendant would be bound to carry out on its part the traffic rate and transfer arrangement. Now, suppose that said franchise had been granted to another company and the defendant had made the prescribed traffic arrangement as to transfers, with said other company, and subsequently this defendant had acquired said other company and there had been a merger or consolidation, would it not under the rule of construction laid down in the *Braffett* case be bound to continue to carry passengers at the same rate of fare? It could not in that case say that because it was no longer required to issue and receive tranfers, the real object and purpose of said fare and transfer provisions should be defeated. The court could not in fairness to the people allow the defendant to take any such position. Is there any true, substantial difference between the case supposed and the case as it is presented in the present ownership? The only difference is that in this case there is an original ownership, whereas, in the case supposed, there would be a substituted ownership, but in the last analysis there is no fair, just or equitable reason why the defendant by its very technical contention should be allowed to defeat the ultimate object which the contracting parties had in mind when they made the contract.

The defendant cites the cases of *Wright & Ankers* v. *New York & Long Island Traction Company,* 3

P. S. C., 2d D., 418, and *Steding* v. *New York & Long
Island Traction Company*, Id. 368; decided by the pub-
lic service commission for the second district, as sup-
porting its contention.

In the *Wright* case the complainant claimed that as
the distance between Rockville Centre and the New
York city line was less than five miles the company was
not entitled to charge more than five cents under its
franchise. In the *Ankers* case the complainant claimed
that the charge of ten cents between Rockville Centre
and Valley Stream was illegal for the same reason.
Both of these cases were attempts to have read into
the franchise of 1903 the provision limiting the fare
charge to five cents for five miles or less, contained in
the 1901 franchise, on the theory that the later fran-
chise was merely an extension of the earlier one. This,
of course, is not so, and the public service commission
properly held that the franchises were independent
of each other and that the clause contained at the end
of the seventh paragraph of the 1903 franchise limit-
ing the company to a charge of five cents for five miles
had reference only to the proportion which the com-
pany should receive as a joint rate.

To the same effect is the *Steding* case. There the
complainant contended that the company in charging
ten cents from Belmont Park to Hempstead village
was exacting an illegal amount of fare, claiming that
under the franchise of 1901 the rate of fare was lim-
ited to five cents for five miles and that the provisions
of that franchise applied to the franchise covering this
line because it was nothing but an extension of it.
The line from Hempstead village to Belmont Park was
operated under a franchise obtained from the board
of supervisors of Nassau county for a street surface
railroad over a county highway. It contains a pro-
vision fixing the fare for a single trip over the whole

route at ten cents.   Thereafter the company obtained a franchise from the highway commissioners covering the same route.   This franchise contained no fare condition whatsoever.   The commission held that this road was also separate and distinct from the road from Mineola to Freeport, with fare conditions of its own, and that the restriction of five cents for five miles contained in the 1901 franchise had no application to it.

The franchise to operate from Hempstead village to Belmont Park was obtained from the county authorities for a line over a county highway.   The highway commissioners have no authority over county highways.   The Belmont Park line was not referred to in the highway commissioners' franchise of June 6, 1901. Hence the rate of fare prescribed by the board of supervisors was legal and the defendant was entitled under the terms of that particular franchise to charge that sum.   The conditions contained in one franchise cannot be read into another franchise unless they are made to interlock or to be co-operative by their own terms and provisions.

If I am correct in my construction of the 1901 and 1903 franchises, it follows that the plaintiff was entitled to ride from Milburn avenue, Baldwin, to Doubleday, Page & Company, at Garden City, for the sum of ten cents, being the fare which she paid.   It is conceded by the defendant that the distance between these two points is about eight miles.   The construction which I have placed upon the franchises under consideration would permit her to ride a distance of ten miles for the fare which she paid; hence her ejection was unlawful.

Nevertheless, the defendant further contends that the plaintiff was bound to comply with the demands of its employees, namely, to pay the additional fare, and that, if she wished to contest its right to charge fifteen

cents for the distance involved, it was her duty to pay the additional fare and then sue for the penalty provided by statute, and that, if instead of paying or leaving she remained in the car and was therefore ejected, she has no cause of action.  In support of this contention the learned counsel for the defendant cite the case of *Monnier* v. *N. Y. C. & H. R. R. R. Co.*, 175 N. Y. 281, where the court held that a person who becomes a passenger in a public conveyance must subordinate his conduct to all rules of the company that are reasonable and valid.  The plaintiff in that case was unable to purchase a ticket owing to the temporary absence of the ticket agent.  The ordinary fare from Oriskany, where he boarded the train, to Utica, his place of destination, was fifteen cents, but when a person had no ticket said fare was nineteen cents,— the extra amount being imposed by the statute as a penalty for failing to purchase a ticket at the station.  The conductor demanded the additional fare but the passenger refused to pay the same and was thereupon ejected.

The cases of *Weber* v. *Rochester, S. & E. R. Co.*, 145 App. Div. 84; *Hanley* v. *Brooklyn H. R. R. Co.*, 110 id. 429; *Nicholson* v. *Brooklyn H. R. R. Co.*, 118 id. 13, and *Mullin* v. *Long Island R. R. Co.*, 136 id. 733, are also cited to sustain the conduct of the defendant.  The rule in these cases is stated in the case of *Weber* v. *Rochester, S. & E. R. R. Co.*, *supra* (p. 88), as follows: "Railroad companies carrying passengers have the right to make reasonable rules and regulations for conducting their business, and they and their agents incur no liability in enforcing them in a proper manner." But all these cases are materially different in their facts and the principles of law applicable thereto from the case at bar.  The amount of fare which a public carrier is entitled to charge does not depend upon any rule of the company,

but is a matter regulated by statute or by the franchise under which it operates.   It is well settled that rules of railroads when reasonable must be complied with, but there can be no rule fixing the rate of fare to be charged, and any attempt on the part of a railroad company to exact more fare than it is lawfully entitled to is not alone unreasonable, but unlawful.   And here is where the distinction arises between the cases cited and the case at bar.   One does not have to comply with a demand of a railroad employee to pay more fare than the company is legally entitled to, and has a right to offer resistance to being ejected for such nonpayment.   Ejection in such a case constitutes a trespass against the person ejected, for which the company is liable in damages.   *Daymon* v. *Westchester St. R. Co.*, 154 App. Div. 796, 799.   Such a state of facts brings the case under the rule laid down in the cases of *Hamilton* v. *Third Avenue R. R. Co.*, 53 N. Y. 25, and *English* v. *Delaware & Hudson Canal Co.*, 66 id. 454, in which it is held that if a passenger has paid his fare and is lawfully upon a railroad car he has a right to resist any attempt to expel him and that ejection gives him a cause of action for damages for any injury which he may have sustained by the act of the company.   This rule was recognized in the case of *Monnier* v. *N. Y. C. & H. R. R. R. Co.*, *supra*, in the opinion of Judge Cullen, on page 289, where he says: "I agree with Judge Bartlett that each party was bound to know and to determine for itself its legal rights, and also that if the plaintiff was within his legal rights he was justified in resisting any attempt to remove him from the cars."

Under my reading of the franchises in question, I find that the defendant was not justified in requiring the plaintiff to pay the additional five cents fare, and that being lawfully upon the car and entitled to ride to

her distination, viz., the stop at the plant of Doubleday, Page & Company, she had a right to resist the defendant's servants in removing her, to the full extent of maintaining her right to be carried to her destination, and that she is entitled to recover such damages as will compensate her for the injuries sustained by her for the asault and battery committed upon her by the defendant's four employees.

These damages should not be punitive, but compensatory, and should include compensation for the injury done to her feelings through the indignity and disgrace of her expulsion. *Aaron* v. *Ward*, 203 N. Y. 351; *Hamilton* v. *Third Avenue R. R. Co., supra; Gillespie* v. *Brooklyn Heights R. R. Co.*, 178 N. Y. 347, 360; *Daymon* v. *Westchester Street R. R. Co., supra.*

The plaintiff testified that she was sick with nervousness; that her wrist and thumb were so swollen that she could not move them and that her neck was stiff where one of the men had held her, and that she suffered pain from said injuries.

Dr. William H. Runcie testified that he examined the plaintiff on the day of the occurrence and found that she had an abrasion on her right arm; that both wrists and her right shoulder were swollen, and that she was extremely nervous at the time of the examination, so much so that she could hardly talk.

I find from the evidence that the plaintiff is fairly and reasonably entitled to an award of $500 damages for the trespass committed upon her.

Judgment for the plaintiff for $500 damages, with costs. Settle findings on notice. Defendant is allowed thirty days' stay and sixty days to make a case.

Judgment for plaintiff, with costs.